UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARY CRAWFORD, *on behalf of J.R.*

                                  Plaintiff,

v.                                                                1:07-CV-1243
                                                                                     (LEK/GHL)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.
_____

APPEARANCES:                                      OF COUNSEL:

MARY CRAWFORD
Plaintiff *pro se*
712 Stanley Street
Schenectady, New York 12307

HON. GLENN T. SUDDABY                    JOHN M. KELLY, ESQ.
United States Attorney for the                  Special Assistant United States Attorney
   Northern District of New York
Counsel for Defendant
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

GEORGE H. LOWE, United States Magistrate Judge

## REPORT AND RECOMMENDATION

      This matter was referred to the undersigned for report and recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits.  Both parties have filed briefs.  Oral argument was not heard.  For the reasons discussed below, I recommend that the matter be

remanded for further proceedings.

**I.      BACKGROUND**

Plaintiff applied for Supplemental Security Income on behalf of her ward[1], J.R., on August 17, 2005. (Administrative Transcript ("T") at 32-35.)  The application was denied on October 27, 2005.  (T. at 28-31.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (T. at 24-25.)  The hearing was held on April 11, 2007. (T. at 130-168.)  On June 28, 2007, the ALJ issued a decision finding that J.R. was not disabled.  (T. at 7-15.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on September 28, 2007.  (T. at 2-4.)  Plaintiff commenced this action on November 28, 2007.  (Dkt. No. 1.)

**II.     APPLICABLE LAW**

**A.     Standard for Benefits**

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") promulgated regulations establishing a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of a disability. 20 C.F.R. § 416.924(a). First, the ALJ considers whether the child is engaged in

---

[1] Plaintiff's relationship to J.R. is described in the record in a variety of ways, including legal guardian, grandmother, cousin, and no blood relation.

"substantial gainful activity." Id. at § 416.924(b). Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations." Id. at § 416.924(c). Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment meets, medically equals, or functionally equals a disability listed in the regulatory "Listing of Impairments." Id. at § 416.924(d).

In order to show that an impairment matches a Listing, the child must show that his or her impairment meets all of the specified criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); 20 C.F.R. § 404.1525(d) (2007).  In order to determine whether a child's impairment "functionally equals" a Listing:

> The ALJ must examine the evidence of record and determine a child's level of functioning in "six domains." The six domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. 20 C.F.R. § 416.926a(b)(1). If a child has "marked" limitations in two of the domains or an "extreme" limitation in one domain, then his impairments will "functionally equal" the Listings, and he will be found disabled. 20 C.F.R. § 416.926a(d).

*White ex rel. Johnson v. Barnhart,* 409 F. Supp. 2d 205, 207-08 (W.D.N.Y.2006).

### B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Brown v. Barnhart*, Civ. No. 02-4523, 2003 WL 1888727, at *4 (S.D.N.Y. Apr. 15, 2003); *Serrano v. Barnhart*, 2003 WL 22683342, at *10; *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing

court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2005); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Serrano*, 2003 WL 22683342, at *10; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

### III.   THE CHILD

J.R. is seven years old. (T. at 27.) His biological mother used cocaine throughout her

pregnancy and J.R. was born with cocaine in his system.  Plaintiff took J.R. home with her from the hospital when he was two days old.  In November 2003, when J.R. was two years old, his birth mother regained custody.  Two months later, J.R.'s mother left him at daycare and did not come back to pick him up.  He was returned to the custody of Plaintiff.  (T. at 99.)  Plaintiff alleges that J.R. is disabled due to Attention Deficit Hyperactivity Disorder ("ADHD") and Fetal Alcohol Syndrome.  (T. at 37.)

IV.   THE EVIDENCE

On May 13, 2004, Plaintiff took J.R. to see Dr. Micaela Nordhauser for a developmental evaluation.  Plaintiff's primary concern was J.R.'s activity level and his aggression toward others.  She told Dr. Nordhauser that J.R. was "always on the go ...[I]t is very difficult for him to be still ... [A] simple outing such as grocery shopping is very difficult.  If he is in the car[t], he will try to climb out of the car[t].  He has learned how to unbuckle the belt.  If he is not in the car[t], he will dart off ...[H]e is not able to sit through dinnertime at home.  He is up and down multiple times ... [H]e throws his food at least once and usually several times every night. [H]e has a very difficult time waiting his turn and is very intrusive."  (T. at 99.)  She reported that J.R. was very aggressive with his foster sister.  Often, unprovoked, he would walk up to his sister and hit her with an object.  On one occasion, he hit his sister near her eye hard enough that she bled.  Plaintiff was concerned that this behavior might escalate.  (T. at 99-100.)

On evaluation, Dr. Nordhauser found that J.R. was "significantly less active, by [Plaintiff's] description, here than at home.  He does engage in purposeful exploration of the toys during today's evaluation [but tends] to go from one toy to the next playing with each relatively briefly.  He does have periods when he sustains play with toys for as long as five minutes."  (T. at

5

100.)  After observing J.R. play, Dr. Nordhauser conducted more formal one-on-one testing.  In this format, "[J.R.] demonstrates stronger organizational skills than during free play.  He demonstrates only mild difficulties with attention and persistence to task and only mild impulsivity.  His nonverbal cognition scores at age level at 34 months ... Language is characterized by receptive skills scoring solidly at age 35 months with receptive language scoring mildly delayed at 26.5 months ... which is 78% of expected."  (T. at 100-101.)

Dr. Nordhauser concluded that J.R. "presents with relatively mild challenges in organization.  By maternal history, however, he is presenting with much greater challenges in the home setting.  His history of in utero exposure to cocaine and alcohol significantly increases the possibility of having a disorder of attention.  Maternal description of [J.R.]'s behavior is strongly suggestive of an early presentation of attention deficit hyperactivity disorder."  (T. at 101.)  Dr. Nordhauser recommended enrolling J.R. in a Head Start preschool program.  After J.R. attended preschool for several months, he would be reevaluated and Dr. Nordhauser would reconsider a formal diagnosis of attention deficit hyperactivity disorder.  *Id.*  Dr. Nordhauser also recommended that "if [J.R.]'s aggressive, unsafe, and other concerning behaviors persist ... he be seen by a child psychologist or child psychiatrist for further evaluation and management."  (T. at 101.)

J.R. began attending a Head Start program in the fall of 2004.  On November 19, 2004, his teacher reported that J.R. enjoyed "science table, dress up, blocks, puzzles, sand and water tables."  J.R. "will play with peers but prefers to play independently."  He "uses bathroom, washes hands, sets table, serves food, cleans up after meals, puts on coat."  He "impresses his wants and needs.  Enjoys books."  He "can recognize [his] name, some colors and shapes."

Goals were to "teach him the skills to initiate play, use of words." (T. at 90.) Other goals were to "encourage him to use bathroom without reminder at the end of the day, zippering coat, work on when it is the appropriate time for running, jumping and dance, keep encouraging use of words and the use of books, keep working on learning shapes and colors." (T. at 91.)

On January 8, 2005, Dr. Nordhauser performed a developmental re-evaluation of J.R. Plaintiff reported that at Head Start on good days, J.R. stayed calm and participated in classroom activities well. On bad days, J.R. required reminders to stay calm. On one occasion, he hit another child. (T. at 96.) Plaintiff reported that J.R. had "shown improvement overall in his activity level and his behavior" and was "less hyperactive than when he was initially seen" but that "he still tends to have a short attention span rarely playing with any toy for greater than five minutes." If redirected from an activity, he "will often be angry and yell 'I said no.'" Plaintiff reported that J.R. continued "to be physically aggressive toward his foster sister if he is angry with his foster mother for redirecting him or not allowing him to have something he wants." (T. at 96.)

Plaintiff reported that J.R. "is now less likely to get into stuff when he is left unattended. It is described that he is now able to go grocery shopping more successfully. He does have to stay in the cart, if not in the cart he will run off. It is described, however, that he no longer tries to climb out of the cart. It is described that he continues to sit well in church. In the past, his foster mother would motivate him with crackers to help him stay seated. She describes that this is no longer necessary ... It is described that he continues to be fidgety during mealtime and has become an increasingly fussy eater. It is described that he still has difficulty waiting his turn, especially if he wants his mother's attention." (T. at 97.)

On evaluation, Dr. Nordhauser found that J.R. did not "demonstrate an increased level of motor drive. In fact, he is calm and attentive in his play today. He stays focused with a flip-up letter/number toy for approximately 10 minutes. This is by far, however, his longest attention to any one toy. He is not rough or impulsive with the toys but does tend to play with each of the other toys for only one to three minutes before moving on. He does return to the dinosaur toys which he seems to like the best of all the toys available. Although he verbalizes statements related to the dinosaurs fighting, he does not actually bang them together or demonstrate destructive behaviors with the dinosaurs." (T. at 96.)

Dr. Nordhauser concluded that J.R. "does not appear to be presenting with behavioral characteristics suggestive of a diagnosis of attention deficit hyperactivity disorder at this time." Dr. Nordhauser recommended that J.R. "continue in his Head Start program with monitoring of development in all areas." (T. at 97.)

On June 1, 2005, J.R.'s Head Start teacher reported that J.R. "enjoys playing with the dinosaurs with his peers ... [He] can wash his hands and use the bathroom independently. He can set his own place setting at meal times ... [He] can use crayons, markers and scissors with control. He enjoys climbing, swinging and playing ball with peers and adults ... [He] can express his needs and wants to peers and adults ... [He] can count to 10. He can recognize his name." (T. at 89.)

On September 15, 2005, J.R.'s Head Start teacher noted that J.R. "is demonstrating average to above average articulation and language skills at this time. Minor developmental articulation errors were noted in conversational speech. He was able to label pictures accurately, repeat sentences, answer questions, and describe object use. He generated sentences of over 8

words in length. He followed directions, grouped like items, and demonstrated comprehension of action agents." No further intervention was recommended. (T. at 84.)

An undated SCAP Head Start Follow-Up Form for Returning Children states that J.R. "is active in classroom, reportedly aggressive at times and easily escalates with certain other children." J.R. "receives no special services" but "has been observed by Dr. Tanzman." There were no concerns about his mental health. (T. at 88.)

In an undated report card, J.R.'s Head Start teacher reported that he "is unable to wait for his turn with a new toy or activity. He often takes things away from other children. He cannot sit still in circle (large group) and [is] constantly moving to the front. He needs to be called on every time or he is very verbal and unhappy. He always calls out 'me me.' He does seem to enjoy school! [J.R.] has a very loud voice and is always active." (T. at 109.)

As noted above, Plaintiff filed the present SSI application in August 2005. On October 19, 2005, consultative examiner Richard Adler, M.D., diagnosed J.R. with a "history of intense cocaine and ethanol exposure in utero with resultant hyperactivity." He stated that J.R. "should be seen by a psychologist to evaluate his level of intellectual function and to assess the degree of hyperactivity." (T. at 114.)

On October 24, 2005, non-examining agency analyst Joseph Paul Dambrocia, PhD, found that J.R. suffered from an "impairment or combination of impairments [that] is severe, but does not meet, medically equal or functionally equal the listings." (T. at 115.) Regarding the domains for functional equivalence, Dambrocia opined that J.R. has "less than marked" limitations on acquiring and using information and attending and completing tasks. (T. at 117.) Dambrocia opined that J.R. has "no limitation" on interacting and relating with others, moving about and

manipulating objects, caring for himself, or in his health and physical well-being. (T. at 117-118.) Dambrocia noted that J.R. "has been followed by Developmental Pediatrics where he has improved over time based on report and observation. He appears to be less hyperactive and restless, and most recent report indicates no behaviors suggestive of ADHD. He is on no medications ... At CE Pediatrician he was noted to be somewhat hyperactive, but appearance, speech, relating and attention/concentration were all [normal]. He is reported to be doing well in school, and school report indicates that he enjoys playing with peers ... and has no difficulties expressing his needs." (T. at 120.)

On June 16, 2006, Dr. Monica M. Meyer diagnosed J.R. with ADHD and fetal alcohol effects and noted that he "may have PTSD related to his time in biologic mother's custody." (T. at 124.)

J.R. began kindergarten in the 2006-2007 school year. Before starting kindergarten, J.R. began taking Concerta for his ADHD. (T. at 157-158.) Plaintiff testified at the ALJ hearing that the medication "slows him down enough to where he can ... grasp what he's being taught in school." (T. at 157-158.)

J.R.'s kindergarten teacher reported that J.R's reading and math skills were "slightly below" grade level. (T. at 68.) J.R.'s teacher did not report any "serious" or "very serious[2]" problems with J.R.'s ability to acquire and use information. The teacher reported that J.R. had "slight problems" comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, providing organized oral

---

[2] The form the teacher completed asked the teacher to categorize J.R's abilities in each category as "no problem," a "slight problem," an "obvious problem," a "serious problem," or a "very serious problem."

explanations and adequate descriptions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (T. at 69.) The teacher reported that J.R. had "obvious problems" with reading and comprehending new material and comprehending and doing math problems. (T. at 69.) The teacher stated that J.R. "benefits greatly from one-on-one or small group instruction. Needs much repetition of skills ... [I]s capable of grade level work and progressing consistently, but prone to self-distract." (T. at 69.)

      J.R.'s kindergarten teacher did not report that J.R. had any "serious" or "very serious" problems with his ability to attend and complete tasks. She reported that he had no problem carrying out single-step instructions. (T. at 70.) The teacher reported that J.R. had "slight problems" paying attention when spoken to directly, sustaining attention during play/sports activities, focusing long enough to finish assigned activities or tasks, refocusing to task when necessary, carrying out multi-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing his own things or school materials, completing class and homework assignments, completing work accurately without careless mistakes, and working at a reasonable pace and finishing on time. (T. at 70.) The teacher reported that J.R. had an "obvious problem" working without distracting himself or others, which occurred daily. (T. at 70.)

      J.R.'s kindergarten teacher did not report any "serious" or "very serious" problems with J.R.'s ability to interact and relate with others. She reported that he had no problems using adequate vocabulary and grammar to express thoughts and ideas. (T. at 71.) The teacher reported that J.R. had "slight problems" asking permission appropriately, relating experiences and telling stories, using language appropriate to the situation and the listener, and interpreting

11

the meaning of facial expressions, body language, hints and sarcasm. (T. at 71.) The teacher reported that J.R. had "obvious problems" playing cooperatively with other children, making and keeping friends, seeking attention appropriately, expressing anger appropriately, following rules, respecting and obeying adults in authority, and taking turns in conversation. (T. at 71.) The teacher reported that behavior modification strategies had been implemented, including a behavior plan, time-outs, and removal from the classroom. (T. at 71.) The teacher had not assigned a personal assistant to J.R., assigned him to a quiet room, changed his school placement, suspended him or expelled him. (T. at 71.) The teacher reported that J.R. "functions best with an adult in near proximity." (T. at 71.)

Regarding J.R.'s ability to move about and manipulate objects, his kindergarten teacher reported that he had no problems and functioned in an age-appropriate manner. (T. at 72.)

J.R.'s kindergarten teacher did not report that J.R. had any "serious" or "very serious" problems with his ability to care for himself. She reported that he had no problems taking care of personal hygiene, caring for his physical needs, or cooperating with taking his needed medications. (T. at 73.) The teacher reported that J.R. had "slight problems" using good judgment regarding personal safety and dangerous circumstances and identifying and appropriately asserting emotional needs. (T. at 73.) The teacher reported that J.R. had "obvious problems" handling frustration appropriately, being patient when necessary, responding appropriately to changes in his own mood, using appropriate coping skills to meet daily demands of the school environment, and knowing when to ask for help. (T. at 73.)

J.R.'s kindergarten teacher reported that J.R. took medication on a regular basis and that his functioning changed after taking the medication. (T. at 74.) J.R.'s teacher reported that J.R.

12

"is more calm and able to function more comfortably in the classroom when he is on his medication. He is less chatty and better able to follow classroom and school rules. He has less difficulty getting along with his peers." (T. at 74.)

J.R.'s teacher reported that J.R. "enjoys school and readily engages in classroom and school activities. He initiates written assignments, but ... doodles and draws on his work papers ... [J.R.] is functioning a few months below grade in learning to read, but he is demonstrating consistent progress ... [J.R.] typically participates fully in reading groups, but at times he is reluctant to go to reading groups if he feels there is something more exciting going on in the classroom." J.R.'s teacher addressed several "[a]reas of concern: [J.R.] is very chatty. He talks impulsively and some days he talks incessantly. He can be very 'wound up' and on these days he does not respond to adults attempting to keep him calm. [J.R.] can be highly distracting and disruptive to classroom tenor. On these days it is not unusual for him to be crawling under the tables, rolling on the rug or running about. It is helpful when there is adult support or older students in the room to sit in near proximity of him. He enjoys working one-on-one." (T. at 75-76.) J.R. "enjoys peers and engages in cooperating play. Although [J.R.] can get along with his peers, he will often get into verbal confrontations that need to be intervened by adults. He has reacted with some aggression - some hitting and pushing - but aggression does not appear to be a big problem at this time ... [J.R.] frequently initiates conversations with adults. He has a sense of humor and likes to joke with adults. He can be funny and witty." (T. at 77.)

J.R. continued to exhibit aggressive behavior at home. For example, Plaintiff testified that she had to keep a close eye on J.R. when he played with other children because on "a couple" of occasions when another child had hurt J.R., J.R. "went into the kitchen, got the

biggest butcher knife and chased the kid." (T. at 155.)

## V.     THE ALJ'S DECISION

The ALJ found that (1) J.R. is not engaged in substantial gainful activity; (2) J.R. suffers from the severe impairments of ADHD and hyperactivity; (3) J.R.'s severe impairments do not meet or medically equal a Listing; (4) J.R.'s severe impairments do not functionally equal a Listing; and (5) J.R. is not disabled. (T. at 11-15.) The ALJ found Plaintiff's testimony "to be mostly credible in light of the evidence throughout the record." (T. at 14.) The ALJ acknowledged "that the consultative examiner ... recommended that the claimant be evaluated by a psychologist to evaluate his level of intellectual functioning and to assess the degree of hyperactivity. However, the Administrative Law Judge does not believe that the record warrants such an evaluation." (T. at 14.)

## VI.    DISCUSSION

### A.     Whether J.R.'s Condition Meets or Medically Equals The Requirements of a Listed Impairment.

The ALJ found that J.R.'s ADHD and hyperactivity are severe but do not meet or medically equal a Listing. The ALJ's analysis of this issue read, in its entirety: "The pertinent Listings require specific findings which are not present in this particular case." (T. at 12.)

When evaluating whether a claimant's impairments meet or equal a Listing, the ALJ must refer to the specific criteria set forth in the Listing. *See, e.g., Morales v. Barnhart*, 218 F. Supp 2d 450, 459-460 (S.D.N.Y. 2002). An ALJ must set forth his or her analysis of the Listing criteria, like other "crucial factors in any determination ...with sufficient specificity to enable (a reviewing court) to decide whether the determination is supported by substantial evidence."

*Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir. 1984). A reviewing court "cannot make an independent determination as to whether the record supports a finding that Plaintiff meets or equals (a Listing). Instead ... the ALJ needs to articulate his basis for finding that Plaintiff does not meet or equal the criteria" for a particular Listing. *Hendricks v. Commissioner of Social Security*, 452 F. Supp. 2d 194, 199 (W.D.N.Y. 2006).

Listing 112.11 is the Listing for ADHD. ADHD is a condition "(m)anifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 112.11 (2007). In order to meet the Listing, a claimant must meet two sets of criteria. Under the "A" criteria, the claimant must show "(m)edically documented findings of all three of the following: (1) marked inattention: ... (2) marked impulsiveness: and (3) marked hyperactivity." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 112.11 (2007). Under the "B" criteria, the claimant must show at least two of the following impairments: (1) marked impairment in age-appropriate cognitive/communicative function; (2) marked impairment in age-appropriate social functioning, (3) marked impairment in age - appropriate personal functioning; or (4) marked difficulties in maintaining concentration, persistence, or pace. 20 C.F.R., Pt. 404, Subpt. P, App. 1 §§ 112.02 and 112.11 (2007). "Marked" is a "more than moderate but less than extreme" degree of limitation. 20 C.F.R. pt. 404, Subpt. P, App. 1., at Listing 112.00(C) (2007).

The ALJ's decision does not mention Listing 112.11 or apply any of the evidence to the requirements of the Listing. By failing to discuss the Listing, the ALJ failed to apply the correct legal standards. Therefore, remand is appropriate.

Defendant argues that the ALJ's finding that J.R. does not meet Listing 112.11 is based

15

on substantial evidence. (Dkt. No. 16 at 18-20.) However, as noted above, a reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. Therefore, it is recommended that this case be remanded for further proceedings, applying the correct legal standards.

        **B.**    **Whether J.R.'s Condition Functionally Equals a Listed Impairment**

The ALJ found that J.R. does not have an impairment or combination of impairments that functionally equals a Listing. (T. at 12-14.)

As discussed above, a functional equivalence decision is based on an analysis of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1) (2007). If a child has "marked" limitations in two of the domains or an "extreme" limitation in one domain, then his impairments will "functionally equal" the Listing, and he will be found disabled. 20 C.F.R. § 416.926a(d) (2007). A "marked" limitation is "more than moderate but less than extreme." 20 C.F.R. § 416.926a(e)(2) (2007). An "extreme" limitation is where the impairment "interferes very seriously" with a claimant's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3) (2007).

The ALJ carefully analyzed the evidence as it related to each of the six domains. (T. at 12-14.) The record before the ALJ contained substantial evidence supporting the ALJ's finding that J.R.'s impairments do not functionally equal a Listing. In particular, the report by J.R.'s kindergarten teacher shows that while J.R. has difficulties in five of the six domains, none of

these problems were severe enough for the teacher to classify them as "serious" or "very serious."

The undersigned notes, however, that Plaintiff filed documents with her complaint that were not considered by the ALJ. In those documents, J.R.'s treating pediatrician opines that J.R. has a moderate to marked impairment in acquiring and using information, a marked to extreme impairment in attending and completing tasks, a moderate impairment in interacting and relating with others, no limitation on moving about and manipulating objects, a moderate impairment in caring for himself, and no impairment in his health and physical well-being. (Dkt. No. 1-3.) This evidence, which is dated November 21, 2007, should be considered on remand[3]. *See Pollard v. Halter*, 377 F.3d 183 (2d Cir. 2004).

### C. The ALJ's Refusal to Order a Consultative Examination by a Psychologist to Evaluate J.R.'s Level of Intellectual Function and to Assess the Degree of Hyperactivity.

Dr. Adler, who consultatively examined J.R., recommended that J.R. "be seen by a psychologist to evaluate his level of intellectual function and to assess the degree of hyperactivity." (T. at 114.) The ALJ declined to order such an examination because he did "not believe that the record warrants such an evaluation." (T. at 14.)

If the record shows that a claimant may suffer from a cognitive or psychological disorder, the ALJ is required to develop the record regarding that disorder even if the claimant has not alleged that disorder as the basis of disability. *Prentice v. Apfel*, 11 F. Supp. 2d 420, 426 (S.D.N.Y. 1998). The ALJ may develop the record by recontacting the claimant's treating sources for more information or by ordering a consultative examination. 20 C.F.R. § 416.912(e)-

---

[3] Defendant states that Plaintiff also attached a report from J.R.'s first grade teacher to the complaint. (Dkt. No. 16 at 14.) That report is not attached to the version of the complaint filed with the Court.

(f) (2007). However, if there is already sufficient evidence in the record for the ALJ to determine whether the claimant is disabled, the ALJ is not required to further develop the record. 20 C.F.R. § 416.927(c) (2007).

The medical evidence before the ALJ was sufficiently ambiguous that a consultative psychological examination would have resulted in a clearer record. Two of the medical opinions in the file state that J.R. is not disabled as a result of ADHD: Dr. Nordhauser found that J.R. "does not appear to be presenting with behavioral characteristics suggestive of a diagnosis of attention deficit hyperactivity disorder" (T. at 97) and the non-examining agency psychologist found that J.R. had "less than marked" or "no" limitations in each of the six domains for functional equivalence. (T. at 115-118.) On the other hand, Dr. Adler diagnosed J.R. with hyperactivity and opined that J.R. "should be seen by a psychologist" and Dr. Meyer diagnosed J.R. with ADHD and possible PTSD. (T. at 124.) Particularly in light of the newly-submitted opinion by J.R.'s treating physician that J.R.'s ADHD markedly limits his abilities, the ALJ should order a consultative examination on remand in order to further develop the record.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[4] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

---

[4] Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: September 12, 2008
       Syracuse, New York

_____
George H. Lowe
United States Magistrate Judge